**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0686-23
               A-0689-23

IN THE MATTER OF A NEW
JERSEY SOLAR TRANSITION
PURSUANT TO P.L. 2018, C.17.

IN THE MATTER OF THE VERIFIED
PETITION OF PLANKTON ENERGY,
LLC FOR AN EXTENSION OF
TIME TO COMPLETE PROJECT
# NJSTRE1547462089 REGISTERED
IN THE TRANSITION INCENTIVE
PROGRAM – 1801 FEDERAL STREET,
CAMDEN, NJ 08105.

_____

IN THE MATTER OF A NEW
JERSEY SOLAR TRANSITION
PURSUANT TO P.L. 2018, C.17.

IN THE MATTER OF REQUEST FOR
WAIVER AND EXTENSION OF
TIME TO COMPLETE
NJSTRE1547450071 IN TRANSITION
INCENTIVE PROGRAM – SOLAR
PV PROJECT FOR KIRAN PATEL.

_____

Argued January 6, 2026 – Decided March 9, 2026

Before Judges Rose and DeAlmeida.

On appeal from the New Jersey Board of Public Utilities, Docket Nos. QO22080472 and QO23030132.

Thomas B. Slocum argued the cause for appellants Plankton Energy, LLC in A-0686-23 and Kiran Patel in A-0689-23 (Norris McLaughlin, PA, attorneys; James H. Laskey and Anthony P. D'Elia, of counsel and on the briefs).

Steven Chaplar, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Steven Chaplar, on the briefs).

PER CURIAM

Petitioners Plankton Energy, LLC (Plankton) and Kiran Patel filed separate appeals from the September 18, 2023 order of respondent New Jersey Board of Public Utilities (BPU or Board) denying their requests for an extension of time to complete solar energy projects registered in the Board's Transition Incentive (TI) program. We consolidate the appeals for purposes of this opinion and affirm.

I.

Pursuant to the Solar Act of 2012, N.J.S.A. 48:3-51 to -87, the BPU administered the Solar Renewable Energy Certificate (SREC) program to incentivize the development of solar energy projects in this state. N.J.S.A. 48:3-

87. The SREC program provided payments to newly constructed solar energy generators in the form of tradeable SRECs representing one megawatt-hour of solar energy generated by a facility connected to the electric distribution system. The value of a SREC was driven by the energy market. See N.J.S.A. 48:3-51.

On May 23, 2018, the Clean Energy Act (CEA), N.J.S.A. 48:3-87.9, was enacted. The CEA directed the BPU to close the SREC program to new applications once the BPU determined 5.1% of the kilowatt-hours sold in the State was generated by solar electric power connected to the electric distribution system (the 5.1% Milestone). The CEA also directed the BPU to complete a study evaluating how to replace the SREC program once the 5.1% Milestone was reached to encourage the continued efficient and orderly development of solar renewable energy generating sources in the State. Ultimately, the study recommended enactment of the Successor Solar Incentive (SuSI) program.

A.   The TI Program.

On December 6, 2019, after the SREC program closed, the BPU established the TI program, N.J.A.C. 14:8-10.1 to -10.7, to provide developers of solar projects a bridge between the closed SREC program and the then-still-to-be-developed SuSI program. The TI program provided eligible projects with Transition Renewable Energy Certificates (TREC) for each megawatt-hour of

3                                                                              A-0686-23

electricity produced. The TREC incentives were specifically tailored for each project.

The TI program began accepting registrations on May 1, 2020. Pursuant to the TI program's regulations, a solar developer had one year from registration with the program to complete construction of the solar project and submit a post-construction certification package. N.J.A.C. 14:8-10.4(f)(4)(ii)(2). TI program rules did not allow for an extension of a project completion deadline, also referred to as the project's expiration date. However, the BPU was authorized to waive its regulations for good cause. N.J.A.C. 14:1-1.2(b).

On July 29, 2020, the BPU issued an order granting a blanket extension of completion deadlines for projects registered in the TI program on or before October 30, 2020, and setting a new project completion deadline of October 30, 2021 for all affected projects. The BPU found the extension was warranted because the solar industry was adjusting to the COVID-19 pandemic and changes in the statewide solar incentive programs.

On June 24, 2021, the BPU issued an order providing for a further six-month extension of project completion deadlines for all projects registered in the TI program as of that date. The BPU found the solar industry was still adjusting to the COVID-19 pandemic and the regulatory uncertainty caused by

4

the anticipated launch of the SuSI program, which remained under development. The BPU determined extending existing TI program project completion deadlines would support the solar industry and protect ratepayers from potential market disruptions that would arise if TI program projects expired before completion and were abandoned.

On July 9, 2021, the Solar Act of 2021, N.J.S.A. 48:3-114 to -120, was enacted. The statute authorized the BPU to launch the SuSI program.

On July 28, 2021, the BPU announced the TI program would close on August 28, 2021, when the SuSI program would begin accepting solar project applications. The final day to submit a new application to the TI program was August 27, 2021.

On August 28, 2021, the Board launched the SuSI program, which had an administratively determined incentive (ADI) program, meant for relatively smaller solar generation projects, and a competitive incentive (CSI) program, intended for larger "grid supply" solar generation projects. N.J.S.A. 48:3-115 to -117; see also N.J.A.C. 14:8-11.4 (detailing eligibility criteria for different classes of projects in SuSI program); N.J.A.C. 14:8-11.5(d)(1) (describing required application information for ADI program).

A-0686-23

On January 26, 2022, the BPU issued an order allowing solar projects registered in the TI program, where the solar developer was unlikely to complete the project by its project completion deadline, to migrate to the SuSI program. To facilitate this, the BPU waived certain technical requirements of the ADI program, such as the prohibition against including projects where construction had already commenced. See N.J.A.C. 14:8-11.4(b) (explaining the ADI program would only be open to new projects that had not commenced commercial operation prior to the opening of the ADI program registration portal). The Board found facilitating the ability of projects registered in the TI program to enter the ADI program would benefit the solar industry and avoid stranding, without incentives, a then-increasing number of TI registrants that might be unable to complete projects within the relevant project completion deadlines.

B.    The Gibbstown Order.

On June 8, 2022, the BPU issued an order pursuant to N.J.A.C. 14:1-1.2(b) granting a conditional six-month extension of the project completion deadline for a TI program solar project in Gibbstown (the Gibbstown Order). That project was accepted into the TI program on June 15, 2020, and had an initial project completion deadline of June 15, 2021. After application of the two blanket

A-0686-23

extensions issued by the BPU, the project's completion deadline was extended to April 30, 2022.

In March 2022, the developer requested an extension of the project completion deadline to July 30, 2022. In April 2022, the developer amended the application, requesting an extension of the project completion deadline to December 31, 2022. In support of its application, the developer stated it completed construction of the project, submitted a post-construction certification package, and documented the project was capable of fully energizing and connecting to the electricity grid. However, the developer alleged the local electric distribution company (EDC) had not completed offsite upgrades necessary to allow interconnection of the project to the electric distribution system at full capacity. As a result, the EDC granted permission to operate (PTO) the project only at partial capacity at the level that could be accommodated by the then-existing electric distribution system.

According to the application, the developer paid all invoices it received from the EDC for the necessary upgrades, the completion of which was entirely in the control of the EDC. The EDC initially advised the developer the offsite upgrades necessary to allow full capacity interconnection to the electric distribution system would be completed by April 2022, in time to meet the

7

project completion deadline. The EDC later informed the developer the upgrades would not be completed until fall 2022. This potentially left a portion of the capacity of the project without access to solar energy incentives for failure to meet the project completion deadline.

In considering the extension application, the Board noted "[t]he general purpose of the TI [p]rogram [r]ules, as well as the timelines contained therein, is to provide a smooth transition to the [SuSI] [p]rogram and support to New Jersey's thriving solar market while safeguarding the interest of the State's ratepayers by doing so at the lowest possible cost." Quoting N.J.A.C. 14:1-1.2(b), the Board noted "[i]n special cases, upon a showing of good cause [it] may, unless otherwise specifically stated, relax or permit deviations from" its regulations. The Board acknowledged waiver of its regulations is appropriate where compelling "full compliance with the rule(s) would adversely affect the ratepayers of a utility . . . , [and] the ability of said utility . . . to continue to render safe, adequate and proper service, or in the interests of the general public." N.J.A.C. 14:1-1.2(b)(1). Applying this authority, the Board found if the Gibbstown developer could substantiate the claims made in its extension application, "the unforeseeable delay in the EDC's completion of its upgrades represents good cause to waive the deadline" and grant a six-month extension.

A-0686-23

In addition, the Board found it was

> concerned that, under the unique circumstances occasioned by the end of the TI [p]rogram, solar developers that enter into interconnection agreements with the explicit understanding that the interconnection upgrades would be complete prior to a project's TI [p]rogram expiration not be penalized for delays in the EDC's construction of upgrades that were funded in good faith by the project developer.

Thus, the Board "ma[de] conditional extensions available to similarly situated parties on comparable terms" where:

> 1.  The project can demonstrate that it was electrically and mechanically complete prior to its TI [p]rogram expiration date, which the Board interprets as a project that could be energized, but for the lack of a necessary [PTO] from the EDC due to factors that are the sole responsibility of the EDC;

> 2.  The project can demonstrate that it had received and satisfied all necessary permits from all authorities having jurisdiction over the project prior to its TI [p]rogram expiration date, including required final inspections; and

> 3.  Project construction was proceeding based on a representation from the EDC that any necessary interconnection upgrades would be completed prior to the project's TI [p]rogram expiration date, that the upgrades were fully funded by the project developer, but that despite the developer's best efforts, the estimated upgrade completion date was unilaterally extended by the EDC.

9

The Board determined to be eligible for a six-month extension under these criteria, a developer must apply for the extension before the project's completion deadline, and submit specified documents. In addition, the BPU ordered:

> In evaluating conditional waiver requests, the TI [p]rogram administrator should review the construction schedule presented by the EDC at the time or after the interconnection agreement was executed, to determine if the EDC's estimated construction schedule was consistent with the project's TI [p]rogram expiration date. So long as the developer timely provided any necessary deposits at the time billed by the EDC, met all other requirements imposed by the EDC, and the construction schedule was otherwise feasible within the constraints of the TI [p]rogram, then the Board believes that solar developers who reasonably relied on the EDC's schedule, and proceeded with the project, should be provided relief.

The Board directed the Gibbstown developer to submit the documents identified in the Gibbstown Order in support of its application.[1]

C.  Plankton's Project.

On August 23, 2021, four days before the deadline for new registrations, Plankton registered a net-metered, non-residential rooftop solar facility in Camden in the TI program. The BPU granted conditional acceptance of the

_____

[1]  On August 17, 2022, the Board issued an order denying fifteen requests to extend TI project completion deadlines. On November 9, 2022, the Board issued an order denying twenty-eight requests to extend TI project completion deadlines.

project registration on August 27, 2021, resulting in a project completion deadline of August 27, 2022.

On July 29, 2022, Plankton filed a petition with the BPU for a seven-month extension of the project completion deadline. According to the petition, Plankton created a construction schedule for its project with an estimated completion date of August 15, 2022. The project design passed through the appropriate design approval channels at PSE&G, the EDC for the project. On October 6, 2021, PSE&G, based on the preliminary design and interconnection diagram for the project, granted conditional PTO. Plankton thereafter continued development of the project by, among other things, pursuing and ultimately receiving municipal planning and zoning approvals, applying for necessary electrical and building permits, paying for equipment and delivery, and commencing construction on a timeline that would have allowed Plankton to complete the project and obtain PTO prior to the project completion deadline.

However, on May 3, 2022, during an onsite meeting, a PSE&G engineer advised Plankton its previously accepted design for the project was not permitted and PSE&G erred when it approved the design. Plankton redesigned the project and submitted the redesigned plans to PSE&G for conditional PTO. The redesigned plans also required the purchase, delivery, and installation of a

new electric cabinet. Plankton stated that on completion of the redesigned project, it would need new municipal code inspections and final PTO. Plankton argued these developments justified an extension of the project completion deadline.

Plankton argued the criteria established in the Gibbstown Order constituted rulemaking without compliance with the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -31. See Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 330 (1984). Thus, Plankton argued the Board could not require satisfaction of the criteria in the Gibbstown Order as a condition of granting an extension. In addition, Plankton argued the Gibbstown Order criteria were too narrow and inflexible to be the only circumstances warranting an extension, given the various obstacles preventing satisfaction of a project completion deadline developers in the TI program might encounter that are outside of their control.

Plankton further argued if the Gibbstown Order did not constitute rulemaking, Plankton's circumstances fit the spirit of the Order and N.J.A.C. 14:1-1.2(b) because it was unable to timely complete its project due to circumstances caused by PSE&G which were unforeseen and outside Plankton's control. Plankton argued it invested considerable time and money into a project

that would otherwise have been timely constructed were it not for PSE&G's error in approving the original project design. Thus, Plankton requested a seven-month extension of the project completion deadline, which it argued was roughly equal to the number of days between issuance of PSE&G's first conditional PTO and the day on which PSE&G reversed its approval of the project design. Plankton noted its project was not financially viable in the SuSI program and would not go forward if not eligible for the TI program incentives.

On March 17, 2023, Plankton filed an amended application. In addition to reiterating its legal arguments, Plankton provided an update on the project's progress. Plankton's redesigned project was substantially completed in August 2022. The municipality, however, did not complete the electrical inspection of the project until March 10, 2023, about seven and one half months after the project completion deadline. Plankton submitted a request to PSE&G for PTO shortly thereafter. Plankton stated it expected to receive PTO in the near future. Plankton amended its extension request from seven months to eight months.

D.    Patel's Project.

Patel's application for a net-metered, non-residential rooftop and canopy solar project in Maple Shade was conditionally accepted in the TI program on August 24, 2021. The project completion deadline was August 24, 2022.

13                                          A-0686-23

On August 16, 2022, Patel requested an extension of "at least [three] months" of the project completion deadline. He alleged he encountered supply chain delays "and other related problems" because of the COVID-19 pandemic, but the system installation was completed. According to Patel, on the day he submitted the extension application, eight days before the project completion deadline, he filed a net meter installation application with PSE&G, the EDC for the project. The installation was needed to complete the project and obtain PTO.

On February 6, 2023, Patel supplemented his application in a document he entitled "[h]ighlights of [p]roject completion & [r]oadblocks." He alleged that on October 26, 2022, PSE&G informed him the electrical system at the project had to be disconnected to connect the project to the electric distribution system and obtain PTO. PSE&G disconnected the system on January 16, 2023, a delay he attributed to PSE&G's "excess workload." The project was completed and in operation as of January 16, 2023. Patel alleged the delay in completing the project and obtaining PTO were attributable to PSE&G and the municipality and "were out of our control."

E.    The BPU's September 18, 2023 Order.

On September 18, 2023, the BPU issued an order denying Plankton's and Patel's extension applications. On Plankton's application, the Board found the

Gibbstown Order was not rulemaking, but an adjudication on the specific facts presented in the Gibbstown project extension application. The Board found the Gibbstown Order did not establish a broadly applicable policy determination, but was an application of N.J.A.C. 14:1-1.2(b) to the facts relating to the Gibbstown project and an attempt to lessen the regulatory burden on a small group of developers in similar circumstances. Thus, the Board concluded issuance of the Gibbstown Order was an exercise of its quasi-judicial, not quasi-legislative authority, and compliance with the APA was not necessary.

Applying N.J.A.C. 14:1-1.2(b), the BPU found relaxation of the project completion deadline was not warranted. The Board found Plankton did not establish the delays in achieving interconnection were solely attributable to the EDC. The Board noted Plankton's timeline for completion of the project, created around the time the project was registered in the TI program, estimated completion of construction in July 2022, with municipal inspections taking place eight days later. After the EDC's May 2022 notification the project needed to be redesigned, Plankton completed the project in August 2022, just one month after the original estimated date of completion. The municipal inspection did not take place until March 2023, seven months after the project was completed, far longer than the eight days estimated in the original timeline. As of March

2023, the EDC had not yet issued PTO for the project. The original timeline, however, estimated PTO would be obtained seventeen days after the municipal inspection.

The Board concluded the EDC's reversal with respect to the project design delayed the project by only one month and the developer's initial estimate of the time necessary for the municipal inspection and issuance of PTO were unrealistic. Plankton did not establish the delay in conducting the inspection and issuing the PTO were unforeseeable or solely attributable to the municipality and EDC. Thus, the Board found Plankton's claim that "but for" the EDC's reversal on the project design the project would have been completed on time "failed" to establish just cause and was not analogous to the circumstances in the Gibbstown Order.

The Board also noted Plankton's project was registered in the closing days of the TI program and Plankton knew or should have known the transition program was closing. The Board found Plankton was aware of the one-year deadline to complete the project and the TI program regulations did not provide for an extension of the project completion deadline. Given the expiring nature of the program, Plankton decided to invest in a project based on what proved to

16

be an unreliable estimated timeline in what soon would be a legacy incentive program.

With respect to Patel's application, the Board found the project was accepted in the final weeks of the TI program when supply chain delays were well known in the industry. The Board noted it had consistently rejected extension requests based on known supply chain delays, which put Patel on notice the Board was not likely to grant an extension for such delays. In addition, the Board found Patel provided no detailed explanation of the alleged municipal permitting delays or justification for his claim the delays were unexpected and out of his control. In addition, the Board found the three-month delay in the EDC's scheduling of the disconnection of the existing electric system was a routine practice Patel should have expected when he considered whether the project could be completed in a year.

Applying its authority pursuant to N.J.A.C. 14:1-1.2(b), the Board concluded good cause did not exist to extend the project completion deadlines for Plankton's and Patel's projects. In reaching this decision, the Board balanced Plankton's and Patel's interests as solar developers who invested in their projects with the public's interest in timely completion of projects, the ratepayers' interest in controlling the cost of solar subsidies, and the State's interest in ensuring solar

A-0686-23

incentive levels appropriately reflect the time during which a project reaches commercial operation. The Board noted it addressed supply chain delays in its two prior orders granting extensions to all projects in the TI program. In addition, the Board determined "general interconnection processing delays" were insufficient to warrant an extension of a project completion deadline. The Board found the one-year project completion requirement in the TI program was an indication the program "was always intended to be limited to those projects mature enough to complete in twelve months." The Board further found Plankton's and Patel's projects were in early phases when they registered in the TI program's final days and the delays they experienced were foreseeable. Finally, the Board determined denial of the extension applications furthers the interests of the State and the public in maintaining an orderly transition from the legacy TI program to the SuSI program and in reducing the cost of achieving the State's solar energy goals.

The Board encouraged Plankton and Patel to register their projects in the ADI aspect of the SuSI program. To facilitate the transfer of the projects to the SuSI program, the Board waived N.J.A.C. 14:8-11.4(b), which prohibited

A-0686-23

admission of projects in SuSI where construction had commenced, for the programs addressed in the September 18, 2023 order.[2] These appeals followed.

Plankton and Patel argue: (1) issuance of the Gibbstown Order was rulemaking without compliance with the APA and was, therefore, an invalid basis on which to deny their extension applications; and (2) even if the BPU did not engage in invalid rulemaking when it issued the Gibbstown Order, its denial of their extension applications was arbitrary and capricious.

II.

We begin with Plankton's and Patel's arguments concerning the validity of the Gibbstown Order. "Administrative agencies enjoy great leeway when selecting among rulemaking procedures, contested hearings, or hybrid informal methods in order to fulfill their statutory mandates." In re Provision of Basic Generation Serv., 205 N.J. 339, 347 (2011). "If an agency determination or action constitutes an 'administrative rule,' then its validity requires compliance with specific procedures of the APA that control the promulgation of rules." Airwork Serv. Div. v. Dir., Div. of Tax'n, 97 N.J. 290, 300 (1984). The APA defines "administrative rule" or "rule" as "each agency statement of general

---

[2] The September 18, 2023 order also rejected in whole or in part the extension applications of sixteen other developers of projects in the TI program.

applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." N.J.S.A. 52:14B-2.

In Metromedia, our Supreme Court provided standards for determining whether rulemaking requirements apply to an agency's decision. 97 N.J. at 331-34. The Court explained:

> [A]n agency determination must be considered an administrative rule . . . if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.
>
> [Id. at 331-32.]

"The pertinent evaluation focuses on the importance and weight of each factor, and is not based on a quantitative compilation of the number of factors which weigh for or against labeling the agency determination as a rule." Provision of Basic Generation Serv., 205 N.J. at 350.

We agree with the Board's conclusion the Gibbstown Order "was an individual adjudication finding good cause to waive portions of the Board's TI [program] rules pursuant to N.J.A.C. 14:1-1.2, based upon the very specific facts presented in that petition." The Gibbstown Order does not purport to establish a good cause standard under N.J.A.C. 14:1-1.2 for general applicability in future cases. Instead, the Board decided there was good cause to extend the project completion deadline for the Gibbstown project based on the specific circumstances presented in the application for that project. The Gibbstown Order also does not establish a legal standard or directive not otherwise inferable from the statutes authorizing the Board to administer solar incentive programs. Nor does the order reflect administrative policy. It instead adjudicated a developer's application for an extension of a project completion deadline under the good cause standard in N.J.A.C. 14:1-1.2.

In the Gibbstown Order, the Board also found TI program developers, in circumstances similar to those experienced by the Gibbstown developer, would

21

be entitled to an extension if they produced specified documents establishing three factors. That finding does not apply to a large segment of the regulated or general public, but rather to a narrow group of developers in a legacy incentive program facing particular circumstances similar to those experienced by the Gibbstown developer that may warrant relaxation of a BPU regulation.

More importantly, the Gibbstown Order does not, as Plankton and Patel argue, define the only set of circumstances constituting good cause for an extension of a TI program project completion deadline under N.J.A.C. 14:1-1.2(b). As evidenced by the Board's analysis in the September 18, 2023 order, the Board considered whether a variety of circumstances constituted good cause for an extension. Nothing in the September 18, 2023 order suggests a developer's inability to establish the exact circumstances or criteria identified in the Gibbstown Order precluded a finding of good cause for an extension under different circumstances. To the contrary, the Board discussed at length delays resulting from a variety of causes and determined for each set of circumstances whether good cause for an extension existed.[3]

---

[3] After briefing was complete, we granted Plankton's motion to supplement the record with two BPU orders: (1) a September 25, 2024 order denying a motion to reconsider the Board's denial of a developer's application to extend the project completion deadlines for several TI program projects; and (2) a February 12,

Turning to the validity of the Board's denial of Plankton's and Patel's extension applications, the scope of our review of a final decision of an administrative agency is limited and we will not reverse such a decision unless it is "arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)). When making that determination, we consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid. (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).]

---

2025 order denying the applications of several developers for extensions of project completion deadlines for TI program projects. Plankton argued these orders underscore that the Gibbstown Order serves as a de facto rule establishing rigid criteria for obtaining an extension of a project completion deadline in the TI program. Our review of those orders does not support Plankton's argument. In the September 25, 2024 order, the BPU described the Gibbstown Order as identifying "one . . . path a petitioner could utilize to seek an extension" before determining whether the specific circumstances identified by the applicant, which differed from those addressed in the Gibbstown Order, constituted good cause for an extension. Similarly, in the February 12, 2025 order, the Board considered both the criteria established in the Gibbstown Order and other circumstances on which the developer relied in their applications for extensions.

A-0686-23

We are, however, "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Carter, 191 N.J. at 483 (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).

During our review, we must remain mindful "[t]he Legislature has endowed the BPU with broad power to regulate public utilities [and] considerable discretion in exercising those powers." In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, 167 N.J. 377, 384-85 (2001) (quoting In re Elizabethtown Water Co., 107 N.J. 440, 449-50 (1987)). The Board's decisions are presumed to be valid "and will not be disturbed unless [the court] find[s] a lack of 'reasonable support in the evidence.'" Id. at 385 (quoting In re Jersey Cent. Power & Light Co. 85 N.J. 520, 527 (1981)). We may set aside a BPU order "when it clearly appears that there was no evidence before the [B]oard to support the same reasonably or that the same was without the jurisdiction of the [B]oard." N.J.S.A. 48:2-46.

Our review of the record reveals sufficient support for the Board's determinations neither Plankton nor Patel established good cause for an extension of the completion deadlines for their projects. As noted above, the Board is authorized to relax its regulations "[i]n special cases and for good cause shown . . . ." N.J.A.C. 14:1-1.2(b). The party seeking relaxation of a regulation

24

bears the burden of establishing good cause. N.J.A.C. 14:1-1.2(b)(2). The record supports the Board's finding Plankton's registration in the last days of the TI program was based on an unrealistic timeline for a project in the early stages of development. In addition, as the Board found, PSE&G's reversal of its approval of the design of Plankton's project resulted in a one-month delay in completing the project. Issuance of PTO was delayed an additional seven months while Plankton awaited municipal inspections. Plankton's original timeline estimated those inspections would take place eight days after completion of the project. Based on this record, we cannot conclude the Board acted arbitrarily or capriciously when it determined Plankton did not establish good cause for an extension.

We reach the same conclusion regarding the Board's denial of Patel's extension application. Also registered in the closing days of the TI program, Patel's early-stage project was delayed by supply chain and interconnection issues well known to the industry at the time of registration. In addition, Patel's extension application was based on vague allegations that "other related problems" and PSE&G's "excess workload" prevented timely completion of the project. Patel applied for EDC approval of the installation of a component of the project necessary to obtain PTO just eight days before the project completion

25

deadline. The Board reasonably found the delays described by Patel were routine and should have been expected by the developer when he decided to invest in a project that had to be completed within one year to qualify for the TI program incentives. We see no basis on which to conclude the Board's decision was arbitrary and capricious.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0686-23